# IN THE COURT OF APPEALS OF IOWA

No. 23-0736
Filed January 10, 2024

**IN RE THE MARRIAGE OF CLINT J. OELBERG
AND SAMANTHA J. OELBERG**

**Upon the Petition of
CLINT J. OELBERG,**
          Petitioner-Appellant,

**And Concerning
SAMANTHA J. OELBERG,**
          Respondent-Appellee.

_____

          Appeal from the Iowa District Court for Pocahontas County, Kurt J. Stoebe,

Judge.


          A father appeals from the order modifying the physical-care provisions of

his marriage dissolution decree.  **AFFIRMED.**


          Tammy Westhoff Gentry of Parrish Kruidenier Dunn Gentry Brown

Bergmann & Messamer, L.L.P., Des Moines, for appellant.

          John M. Murray of Murray & Murray, P.L.C., Storm Lake, for appellee.


          Considered by Bower, C.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

When Clint and Samantha Oelberg divorced in September 2020, the district court granted them joint physical care of their then-two-year-old son. They have since alternated care every two weeks between their homes about four hours apart. By all accounts, they are both excellent parents. And their cooperation and communication have been reasonably good under the circumstances. But as their son approached the start of kindergarten this fall, they both agreed that their long-distance joint-physical-care arrangement cannot continue; one of them has to become the primary caregiver. So they sought to modify the original decree.

The district court wrestled with this "happily difficult situation" and ultimately granted Samantha physical care with robust visitation for Clint. Clint now appeals, arguing that the court gave too much weight to placement of their son with his older half-sisters who also live with Samantha and too little weight to the stability Clint could provide. Clint also contends that placement with him would better serve their son's long-term interest because Clint is immersed in the Deaf community and communicates exclusively with American Sign Language ("ASL"), while Samantha is not as involved and her home is bilingual, using both spoken English and sign language. Clint reasons the stronger connections and fluency are important both to foster a strong relationship between father and son and because their son has recently been diagnosed with some loss of hearing himself.

Clint's novel arguments about the relative benefits of placement in a bilingual home compared to an ASL-exclusive one raise some interesting questions. But we do not have the inherent expertise to decide that either type of home is better for their son's physical, mental, and social development. Neither

party presented expert testimony or scientific literature to help us make such a decision. And because both parents identify as Deaf and Clint will retain substantial contact with their son, this is not the case to explore how to weigh an interest in maintaining a child's connection to Deaf culture.

So given the otherwise closely balanced interests, we cannot conclude that Clint presents any good and compelling reason to separate their son from his half-sisters. We thus affirm the district court's decision and decline Samantha's request for appellate attorney fees.

### I. Background Facts and Proceedings

Clint and Samantha Oelberg divorced in September 2020 after a two-and-a-half-year marriage. Both are deaf. Clint was born deaf, and while he can hear some sounds with his hearing aids, he communicates primarily through ASL. Samantha lost most of her hearing after contracting meningitis when she was fourteen months old. But she retains some ability to hear and can read lips. And she communicates both with her voice and ASL.

Clint and Samantha had one son together during their marriage. For the first several years of his life, their son had no identified hearing loss and learned to speak English and sign ASL. Samantha also has two daughters from previous relationships—one about three years older than their son and the other about six years older. Neither daughter has any hearing loss, and they communicate mostly in spoken English. But they also know some sign language.

All five family members lived together in Clint's home in Gilmore City during the marriage. Clint worked full-time. Samantha originally worked part-time at a daycare but became a stay-at-home mom shortly before their son was born.

In 2020, Clint and Samantha separated. She and the girls moved about four hours away—first to Gary, South Dakota, then to a nearby town, Canby, Minnesota, where she bought a home. Their eventual dissolution decree adopted the parties' stipulation to joint legal custody and joint physical care of their son. They alternated care every two weeks, and their son attended preschool and daycare near each parent when he was in their care.

Since shortly after she moved to the area, Samantha has worked about twenty hours per week as an assistant manager of a grocery store deli. She also receives social security disability benefits. Most of the time that their son is with Samantha, his older half-sisters are also in her care.[1] The three kids have developed strong and positive relationships with each other.

Clint still resides in the same home in Gilmore City that he has for the past seven years, including throughout their marriage. He also continues to work for the same employer that he has for the past sixteen years. He is close friends with his boss at work, who is also deaf. And he maintains ties with a dozen or so other deaf friends in Gilmore City and the surrounding area.

At the age of four—and just a few months before the trial here—their son was diagnosed with some hearing loss. He will need to continue to be assessed to determine whether his hearing remains stable or declines further. He still communicates in both spoken English and ASL. He had good fluency in ASL for

---

[1] Samantha has physical care of the younger daughter; so she is nearly always present except every other weekend when her father has visitation. Samantha has joint physical care of the older daughter; so she is present in the home every other week. This means at least one half-sister is almost always present. And about half the time, both are present.

his age. When he stays with Samantha, she and his half-sisters communicate with him in both languages. When he stays with Clint, they communicate solely in ASL.

With their son due to start kindergarten in the fall of 2023, Samantha petitioned to modify the decree, arguing that joint physical care was no longer appropriate and seeking primary physical care. Clint agreed that modification was necessary but argued that he should be awarded physical care instead of Samantha.

After a trial in March 2023, the district court granted physical care of their son to Samantha and maximized visitation to Clint, including the entire summer except for one week per month when their son would return to Samantha. The court praised the parties for their excellent care and cooperation, calling this a "textbook example" of where joint physical care would be appropriate but for the parties' distance and the need to attend a single school. The court reasoned that in determining their son's best interests in this "happily difficult situation," Samantha had a "slight advantage" because she was their son's primary caregiver until they separated. And the court found that the balance further tilted to her because it was in their son's best interests to maintain his strong and beneficial relationships with his half-sisters together in her home. Clint now appeals.

## II.    Physical Care

Modifications of physical-care provisions of a dissolution decree are decisions in equity, so we review the district court's decision de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015); *see also* Iowa R. App. P. 6.907. While we make our own findings of fact, we give weight to the district court's findings because "a court is greatly helped in making a wise decision about

the parties by listening to them and watching them in person." *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974). "In contrast, appellate courts must rely on the printed record in evaluating the evidence" and "are denied the impression created by the demeanor of each and every witness." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

Neither party disputes that the requirements for modifying the joint-physical-care provision in the original decree are satisfied here. *See In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983) (summarizing requirements). And we agree that joint physical care is no longer in their son's best interest—now that he has reached school age—because of the distance between their homes and the need for him to attend a single school. We thus focus on the critical issue: whether the district court correctly decided that placement of their son in Samantha's physical care better serves his interests than placement with Clint.

In deciding which parent should be granted physical care, our guiding principle is "what is best for the *child*"—not what is "fair[est] to the *spouses*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We consider the factors in Iowa Code section 598.41(3) and those discussed by our supreme court in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *See In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). Our goal is placing the child "in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

As they did in the district court, both Clint and Samantha point to factors where they perceive they have a slight edge over the other parent in providing the best environment for their son and try to minimize those favoring each other. Clint

in particular argues that his relative stability in employment and housing compared to Samantha's more frequent moves would benefit their son and that it would be unfair to weigh Samantha's time at home with their son against Clint since he was providing the family with stable support. But stability in the child's relationship with his caregiver is more important than geographic stability. *See In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998). And we do not consider the relative perceived fairness to the parents. *See Hansen*, 733 N.W.2d at 695; *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) (rejecting argument that the presumption in favor of placing half-siblings together gives a natural parent of the half-sibling an unfair advantage since the "primary concern is the welfare of" the child being placed).

In any event, the district court only gave Samantha a "slight advantage" on this point. Weighing these points ourselves, we do not find that either parent moves the scales—not because of any perceived unfairness, but because both have shared care equally for a longer and more recent time period and because Samantha quickly settled back into a stable environment supported by her family after the disruption caused by the separation.

So we find ourselves with the parties "at a virtual standoff in terms of their performance as parents." *Orte*, 389 N.W.2d at 374. Yet one other key factor "weighs heavily" to break this balance in favor of granting physical care to Samantha: the "strong interest in keeping children of [dissolved-marriage] homes together." *Id.* Children of dissolved-marriage homes are "innocent victims" of the dissolution who should not be denied "the benefit of constant association with each other" unless "their best interests require it." *In re Marriage of Wahl*, 246 N.W.2d

268, 270 (Iowa 1976). It matters not whether the children are full siblings or half-siblings. *Orte*, 389 N.W.2d at 374.

Clint and Samantha's son developed a close relationship with his two older half-sisters during their time together in the marital household and over the last several years of shared care. They are relatively close in age—especially the younger sister who is only about three years older than their son. And while sometimes all three children will not be in the home together because of their varying care and visitation schedules, most of the time they will. With all that in mind, depriving Clint and Samantha's son of these important bonds that he has known his entire life would not be in his best interest.

Clint argues that their son's "cultural and linguistic development"—and thus his relationship with Clint—will suffer with his placement in Samantha's physical care because of the bilingual communication in her home and weaker connections to the Deaf community.[2] And so he contends that the general presumption in favor of placement with half-siblings is overcome here. While Clint is correct that the general rule against separation "is not ironclad," he must show "good and compelling reasons" to depart from it. *In re Marriage of Will*, 489 N.W.2d 394, 398 (Iowa 1992) (cleaned up). And he has not done so here.

It does not intuitively follow that placement in a home with family members who use both ASL and spoken English will harm the linguistic development of a young boy who also uses both forms of communication. Clint firmly believes that

---

[2] Clint also again argued that his greater stability is a good and compelling reason to overcome the presumption. But as we have already explained, these other factors come out as a wash. They thus do not provide a basis to support separating Clint and Samantha's son from his half-sisters.

it will. But that mere belief is not a good and compelling reason. And Clint presented no expert testimony nor pointed us to any scientific literature that would give us a basis to find that their son's development will suffer if he is primarily in a bilingual home. *Cf. Uhler v. Graham Grp., Inc.*, 992 N.W.2d 577, 582–84 (Iowa 2023) (discussing need for expert testimony—in another context—when the issue is "beyond a layperson's knowledge" and "the analytical gap between the evidence presented and the inferences to be drawn is too wide" (cleaned up)). To be clear, we likewise see no basis to find that their son would suffer developmentally if placed primarily in Clint's solely-ASL home. But given the strong interest in keeping the siblings together, we would need something more than speculation to find that separation would better serve their son's long-term best interests.

Neither does an interest in maintaining their son's connection to Deaf culture affect the analysis here. Clint raises thoughtful points about understanding "deafness as a distinct cultural identity category" and the importance of maintaining connection within the Deaf community. *Cf. In re L.L.*, 459 N.W.2d 489, 496–97 (Iowa 1990) (holding that retention of racial identify is properly considered in the best-interests analysis for termination of parent rights under chapter 232, while cautioning it is just "one of many" factors that does not "outweigh all the others"). But this case does not present us with a choice between placement with one parent within the Deaf community and another who is not.

Samantha too identifies as a Deaf person, is fluent in ASL, played a major role in teaching their son ASL, and uses ASL in her home. And she has supported video calls between Clint and their son to communicate together in ASL when he is in her care. We expect all that positive conduct to nurture their son's ASL fluency

and connection with Deaf culture to continue. What's more, Clint will have extended periods of visitation each summer that will provide their son longer periods of immersion in ASL-only communication and access to Clint's network of others in the Deaf community.

Clint and Samantha have worked mightily to cooperate for the benefit of their son up until now. And like the district court, we regret that the physical distance between the parties requires choosing one for physical care and limiting the other to visitation. But we agree that placement of their son in Samantha's physical care is in his best interests. So we affirm the district court.

## III.    Appellate Attorney Fees

Samantha requests that we award her appellate attorney fees. While appellate attorney fees are not awarded as a matter of right, we may award them as a matter of discretion "to the prevailing party" in a modification proceeding. Iowa Code § 598.36 (2022); *see also In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999). In exercising that discretion, we consider "the parties' respective abilities to pay," the extent that the party prevailed, and whether the party had to defend the trial court's decision on appeal. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).

Here, Samantha does have less income than Clint—but neither is wealthy with a substantial ability to pay. They both sought a modification of the original decree and we—like the district court—find the issue of who should receive physical care to be close. We thus exercise our discretion to decline an award of appellate attorney fees.

**AFFIRMED.**